IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BILLIE S. SELLERS,            )
                              )
          Plaintiff,          )
                              )
     v.                       )          1:21cv52
                              )
WAKE FOREST UNIVERSITY BAPTIST )
MEDICAL CENTER,               )
                              )
          Defendant.          )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief United States District Judge.

This lawsuit arises from Plaintiff Billie Sellers's alleged wrongful discharge and emotional distress as a result of the circumstances of her employment with Defendant Wake Forest University Baptist Medical Center ("WFUBMC"). Before the court is WFUBMC's motion to dismiss and, in the alternative, motion for summary judgment. (Doc. 18.) Sellers has filed a response in opposition (Doc. 22), to which WFUBMC filed a reply (Doc. 23). For the reasons set forth below, WFUBMC's motion to dismiss and motion for summary judgment will be granted.

## I. BACKGROUND

The facts, either not in dispute or viewed in the light most favorable to Sellers as the non-moving party, establish the following:

Sellers is a nurse practitioner who was employed by WFUBMC from October 2018 to July 2020. (Doc. 2 at 1.) She has a history

of both Attention Deficit and Hyperactivity Disorder (ADHD) and Generalized Anxiety Disorder (GAD). (Doc. 19 at 3.) Sellers was pregnant when she first started at WFUBMC and advised her manager, Dierdra Robinson, that she could not take her ADHD medication while pregnant. (Doc. 20-1 at 113:1-6.) The non-physician staff were all provided carrels in the practice; physicians were provided offices. (Doc. 20-7 at ¶ 6.) However, Sellers also told Robinson, "I would really benefit from a closed area to get, you know, this new work done and so I can succeed in this new career." (Id. at 113:6-9.) After this conversation, WFUBMC also provided Sellers access to a doctor's closed office which Sellers says she used for "a few days a week." (Id. at 113:10-12.)

Robinson and Sellers continued to have conversations regarding Sellers's need for a quiet workspace. At some point, Robinson advised that it might be possible to convert one of Sellers's examination rooms into an office for her. (Doc. 20-1 at 114:3-16.) After Sellers was able to use the doctor's closed office, Sellers's carrell was moved away from Robinson's door to a different space where there was "a little more privacy and kind of wall bend for noise block" in an accommodation. (Id. at 116:13-25.) Sellers was told by another nurse practitioner "that doctors get offices and all the midlevels get the work stations." (Id. at 120:5-6.)

In March 2019, Paige Rideout became Sellers's new manager.

(Doc. 20-6 at ¶ 2.) Rideout was initially open to the possibility of converting an examination room into an office for Sellers, however Sellers "didn't want to do that, to take away from [her] patient room because [she] only had three and [she] wanted to see them an ample amount of time." (Doc. 20-1 at 123:2-13.) Rideout also offered her office to Sellers for her use whenever Rideout was out of the office. (Id. at 123:13-17.) In total, Sellers "frequently" used the office of Dr. Lori Smith, who worked part-time, and also utilized Rideout's office "once or twice." (Doc. 20-7 at ¶ 6; Doc. 20-6 at ¶ 15(c); Doc. 20-1 at 123:18-23.) Sellers began her maternity leave in mid-May 2019 and did not return until mid-August 2019. (Doc. 20-6 at ¶ 3.)

At some point in early January 2020, Sellers reiterated her request for a quiet workspace. (Doc. 2 at ¶ 30.) On January 23, Sellers got in an argument with her certified medical assistant, Niki Stukes. (Doc. 20-6 at ¶ 4.) Although the exact phrases used are disputed, Sellers was upset at the pace with which Stukes completed her job and proceeded to loudly voice her anger at Rideout in front of other employees. (Id.) After this argument, Rideout, Sellers, Stukes, and Dr. Lori Smith, Sellers's physician supervisor, met on January 31, 2020, to discuss ways to communicate more constructively. (Id.)

Beginning in March 2020 until April 7, Sellers took continuous leave pursuant to the Family and Medical Leave Act of 1993 (FMLA),

3

29 U.S.C. § 2601 et seq. (Doc. 2 at 2.) While Sellers was on leave, a meeting was set for April 7 with her, Virginia Dodd Pulaski, Associate Director of Operations at Wake Forest Baptist Health, and Rideout. (Doc. 20-6 at ¶ 6.) On April 7, however, Sellers did not appear for this meeting, and instead stayed in an examination room with a patient for much longer than expected. (Id.) The next day, April 8, Sellers returned to FMLA leave, which ran until early May 2020. (Id.)

At no point in time did WFUBMC ever refuse Sellers's request for leave or refuse to grant her time to attend medical appointments. During her continuous leave, Sellers was unable to access her personnel files because WFUBMC had disabled her computer accounts for that period. (Id.) When she returned to work in May 2020, Sellers changed her continuous FMLA leave to intermittent leave and received four hours of leave per week. (Id.) Additionally, starting in May, two vacant offices were available when a medical group left the building, and they were made available for Sellers's use all the time. (Doc. 22-1 at 133:5-21.) Sellers permanently moved her office supplies and received an empty office in which she could remain because it was not currently in use. (Id.)

Sometime in May 2020, Chad Harris, the clinical coordinator to which all certified medical assistants including Stukes report, reported that some assistants had complained to him about the way

4

they were treated by Sellers. (Doc. 20-4 at ¶ 8.) Chief among those complaints was Sellers's apparent temper. For instance, Sellers had become angry when Stukes, her assistant, refused to pick up a dirty paper towel that Sellers had thrown on the floor stating that picking up trash was "beneath her." (Id. at ¶ 9.) One certified medical assistant reported that Sellers had called Rideout a "fucking bitch" and the assistant was afraid of Sellers's irritation. (Id.) Sellers had also complained directly to Harris that her assistant, Stukes, "used to be great, but now is lazy." (Id.) Based on this information, Pulaski and other administrators met with Sellers and issued her a Verbal Advisory, the lowest level of formal discipline, on May 26, 2020. (Id. at ¶ 11.)

Later that evening, Sellers sent a screenshot of her Verbal Advisory to Harris. (Doc. 20-2 at ¶ 5.) Sellers made no comment, but the text referenced the information Harris had provided Pulaski and identified him by name. (Id.) Harris reported feeling threatened and intimidated by the message. (Id. at ¶ 6.) Harris made Pulaski aware of the situation, at which point Pulaski informed him that she had escalated this incident to Employee Relations. (Id. at 11.) Sellers was then placed on administrative leave until June 2. (Doc. 20-6 at ¶ 11.) When she returned on June 2, Sellers met with Rideout and others from Employee Relations to discuss her behavior. (Id.) After this meeting, Sellers sent a text to Harris apologizing for texting him the screenshot on the

5

evening of May 26.  (Id. at ¶ 6.)

On June 12, Sellers emailed her supervisors and others, tendering her resignation.  (Doc. 20-1 at 90:9-16.)  Sellers offered to continue working for a period of four weeks and proposed July 2 as her last workday.  (Id.)  While she proposed July 2 as her last day, her notice period ran through July 12, which included the week she was on rotating furlough.  (Id.)

After submitting her resignation, Sellers requested an exit interview with Dr. Elisabeth Stambaugh, Chief Medical Officer of Wake Forest University Health Network, and a representative from human resources.  (Doc. 20-8 at 1.)  This meeting took place on June 24, 2020.  (Doc. 20-8 at ¶ 5.)  During this exit interview, Sellers sought to rescind her resignation.  (Doc. 20-1 at 421:19-422:11.)  Dr. Stambaugh decided to let Sellers's resignation stand but informed her that she was welcome to apply for other positions within the WFUBMC system.  (Doc. 20-8 at 2.)

Sellers filed this lawsuit in state court, and WFUBMC timely removed it to this court.  (Doc. 1.)  Sellers presents four claims: 1) constructive discharged for taking FMLA leave; 2) "emotional distress"; 3) failure to reasonably accommodate her ADHD and GAD in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq.; and 4) failure to pay bonuses.  (Doc. 2.)  WFUBMC filed an answer generally denying Sellers's allegations (Doc. 5) and now moves to dismiss the complaint pursuant to Rule

6

12(b)(6), and alternatively for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 18.)

## II. ANALYSIS

### A. Jurisdiction and Standard of Review

This court has jurisdiction over Sellers's ADA claim because it arises under federal law. 28 U.S.C. § 1331. The court exercises supplemental jurisdiction over Sellers's state law claims for constructive discharge and intentional or negligent emotional distress because they stem from the same factual nexus as her federal claim: her working conditions and alleged attempts by WFUBMC to deny her an adequate working environment free from harassment. Id. § 1367(a) (granting "supplemental jurisdiction over all other claims that are [sufficiently] related to claims in the action within such original jurisdiction"); B.R. v. F.C.S.B., 17 F.4th 485, 492 (4th Cir. 2021). As to the state claims, the court applies state substantive law and federal procedural law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 72-73 (1938); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (holding that federal courts are "bound to apply state law" to pendant claims). In doing so, the court looks to the jurisprudence of North Carolina's highest court, the supreme court. See Priv. Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002); State ex rel. Martin v. Preston, 385 S.E.2d 473, 478 (N.C. 1989) (noting that "issues concerning the

7

proper construction and application of North Carolina laws and the Constitution of North Carolina can only be answered with finality by" the North Carolina Supreme Court). When that court has not spoken directly on an issue, this court must "predict how that court would rule if presented with the issue." Id. The decisions of the North Carolina Court of Appeals are the "next best indicia" of what North Carolina's law is, though its decisions "may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. (quoting Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992)). In predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted).

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In considering a Rule 12(b)(6) motion, a court "must accept

8

as true all of the factual allegations contained in the complaint,"
Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all
reasonable inferences must be drawn in the plaintiff's favor,
Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). "Rule
12(b)(6) protects against meritless litigation by requiring
sufficient factual allegations 'to raise a right to relief above
the speculative level' so as to 'nudge[] the[] claims across the
line from conceivable to plausible.'" Sauers v. Winston-
Salem/Forsyth Cty. Bd. of Educ., 179 F. Supp. 3d 544, 550 (M.D.N.C.
2016) (quoting Twombly, 550 U.S. at 555). Mere legal conclusions
are not accepted as true, and "[t]hreadbare recitals of the
elements of a cause of action, supported by mere conclusory
statements, do not suffice." Iqbal, 556 U.S. at 678.

A court must grant a motion for summary judgment if the
pleadings, depositions, and affidavits submitted show that there
is no genuine dispute as to any material fact and the moving party
is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).
A fact is considered "material" if it "might affect the outcome of
the suit under the governing law." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986). Under this standard, a genuine
dispute of material fact exists "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Id. As a result, the court will only enter summary judgment in
favor of the moving party when the record "shows a right to

judgment with such clarity as to leave no room for controversy" and clearly demonstrates that the non-moving party "cannot prevail under any circumstances." Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994) (internal quotation marks omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact-finder] functions . . . ." Anderson, 477 U.S. at 255. On summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id.

While the movant bears the initial burden of demonstrating the absence of any genuine dispute of material fact, once that burden has been met, the non-moving party must demonstrate that a genuine dispute of material fact actually exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 521 (4th Cir. 2003). A mere scintilla of evidence is insufficient. Anderson, 477 U.S. at 252. Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. Id. at 248-49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315-16 (4th Cir. 1993).

**B.  Wrongful Discharge**

Sellers's first claim alleges that WFUBMC, through its employees, "placed undo [sic] stress upon Plaintiff in an effort to force her to quit." (Doc. 2 at 2.)  This undue stress includes changing her patient schedule without notice, increasing her patient loads, "encouraging insubordination by her medical assistant," and minimizing her concerns.  (Id.)  WFUBMC moves to dismiss this claim for failing to state a claim upon which relief can be granted, arguing that North Carolina courts do not recognize constructive discharge as a basis for a wrongful discharge claim. (Doc. 19 at 2.)  In the alternative, it moves for summary judgment on the grounds Sellers voluntarily resigned her position and was not retaliated against for taking FMLA leave.  (Id.)

Sellers characterizes her claim as one for "wrongful discharge" because she was "constructively terminated by Defendant in violation of the FMLA." (Doc. 2 at 1-2.)  Based on the complaint alone, Sellers alleges the common law tort of wrongful discharge in violation of public policy — here the FMLA.  In her briefing, however, she argues that her claims "are not for an independent, common law tort claim of constructive discharge but rather identify constructive discharge as one of the adverse employment actions taken against Plaintiff by the Defendant under the disability discrimination and FMLA retaliation claims." (Doc. 22 at 11.) Despite the reference to the FMLA in her complaint, Sellers's brief

11

captions her constructive discharge claim as predicated on the ADA, and she included no such FMLA retaliation claim in her complaint. (Doc. 22 at 10.)[1] Rather, she has four claims: one for "wrongful discharge"; the second for "emotional distress"; the third for the "American [sic] with Disability [sic] Act"; and fourth for "bonus monies." (Id.) A motion to dismiss evaluates the sufficiency of the complaint only, Iqbal, 556 U.S. at 678, which plainly characterizes her claim as one for wrongful discharge. Her first claim seeks damages suffered from her alleged wrongful discharge, not from WFUBMC's alleged violation of the FMLA.

Accepting all the facts pleaded by Sellers as true, she has failed to state a claim upon which relief can be granted. North Carolina courts do not recognize a cause of action for wrongful constructive discharge. See Whitt v. Harris Teeter, Inc., 614 S.E.2d 531 (N.C. 2005) (per curiam) (adopting dissenting opinion at 598 S.E.2d 151, 159 (N.C. Ct. App. 2004) (McCollough, J., dissenting)). Federal district courts applying Whitt have construed its holding to preclude a claim of wrongful constructive discharge altogether. See, e.g., Perry v. Diversified Wood Prods.,

---

[1] In addition to failing to allege a claim for retaliation under the FMLA in the complaint, Sellers failed to provide any evidence that she exhausted such a claim. See Sydnor v. Fairfax Cnty. Va., 681 F.3d 591, 593 (4th Cir. 2012) (noting that "a plaintiff must exhaust his administrative remedies by filing a charge with the EEOC before pursuing a suit in federal court").

Inc., 2018 WL 3945933 at *7 (E.D.N.C. Aug. 16, 2018) (collecting cases). This is because North Carolina is an "at-will" employment state, meaning that employees can be fired at any time and for any non-discriminatory reason, or even no reason. Still v. Lance, 182 S.E.2d 403 (N.C. 1971). The state recognizes an exception to the rule where the termination violates the express public policy of North Carolina. Coman v. Thomas Mfg. Co., Inc., 381 S.E.2d 445, 447 (N.C. 1989); Amos v. Oakdale Knitting Co., 416 S.E.2d 166, 169-70 (N.C. 1992) (recognizing a wrongful discharge claim where an employee was terminated for refusing to work for less than the state minimum wage). These protected or prohibited activities are "confined to the express statements contained within [North Carolina's] General Statutes or [the State] Constitution." Whitings v. Wolfson Casing Corp., 618 S.E.2d 750, 753 (N.C. Ct. App. 2005).

The FMLA, as a federal law, does not meet this exception to create the requisite state policy for a claim of wrongful discharge under North Carolina law. See Baucom v. Cabarrus Eye Ctr, P.A., No. 1:06CV209, 2007 WL 1074663 at *7 (M.D.N.C. Apr. 4, 2007) (dismissing a wrongful discharge claim based on violations of the FMLA pursuant to Rule 12(b)(6)); Gomoll v. Landura Mgmt. Co., Inc., No. 1:04CV857, 2005 WL 1230788 at *2 (M.D.N.C. Apr. 28, 2005) (same); Brewer v. Jefferson Pilot Standard Life Ins. Co., 333 F. Supp. 2d 433, 439 (M.D.N.C. 2004) (same); Buser v. S. Food Serv.,

<u>Inc.</u>, 73 F. Supp. 2d 556, 565 (M.D.N.C. 1999) (declining to hold that violation of the FMLA rises to the level of a state public policy). For this reason, Sellers has failed to state a claim upon which relief can be granted to the extent that she relied on any violation of the FMLA to establish the basis for a "wrongful discharge" claim.

Sellers does not provide any legal argument in support of a claim of wrongful discharge under the FMLA. Rather, in her response to WFUBMC's motion to dismiss, she recites the standard for a plaintiff to prevail on a constructive discharge claim under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e <u>et seq</u>. (Doc. 22 at 11-12.) Title VII appears nowhere in her complaint. Somewhat confusingly, Sellers argues that many "federal courts have allowed constructive discharge claims associated with violation of federal statutes." (<u>Id.</u> at 10-11.) Because some courts have found that constructive discharge claims can be supported by claims under Title VII, Sellers argues, her claims "identify constructive discharge as one of the adverse employment actions taken against Plaintiff by the Defendant under the disability discrimination and FMLA retaliation claims." (<u>Id.</u> at 11.) Even were her claim to be so construed, it fails.[2]

---

[2] Whether Sellers's claim is for constructive discharge for violation of the ADA, for an FMLA retaliation claim which does not appear in her complaint, or for a violation of Title VII, the standard is the same. <u>See</u> <u>Sowers v. Bassett Furniture Indus., Inc.</u>, No. 4:19CV39, 2021 WL

14

An employee is entitled to relief absent a formal discharge "if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit." <u>Martin v. Cavalier Hotel Corp.</u>, 48 F.3d 1343, 1353-54 (4th Cir. 1995) (internal quotations omitted).   To prevail on a claim for constructive discharge, a plaintiff must prove two elements: 1) the deliberateness of the employer's actions, motivated by an improper reason such as racial bias or age discrimination, and 2) the objective intolerability of the working conditions. <u>Freeman v. Dal-Tile Corp</u>, 750 F.3d 413, 425 (4th Cir. 2014) (quoting <u>Honor v. Booz-Allen & Hamilton, Inc.</u>, 383 F.3d 180, 187 (4th Cir. 2004)). In evaluating whether working conditions are intolerable, courts use an "objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." <u>Bristow v. The Daily Press, Inc.</u>, 770 F.2d 1251, 1255 (4th Cir. 1985). The law "does not permit an employee's subjective perceptions to

276169, at *7 (W.D. Va. Jan. 27, 2021) (plaintiff alleging claim for constructive discharge as a result of ADA discrimination must have experienced "objectively intolerable working conditions . . . [by] 'show[ing]: (1) that the employer's actions were deliberate, and (2) that working conditions were intolerable.'" (quoting <u>Lacasse v. Didlake, Inc.</u>, 712 F. App'x 231, 239 (4th Cir. 2018); <u>McCormack v. Blue Ridge Behav. Healthcare</u>, 523 F. Supp. 3d 841, 851-52 (W.D. Va. 2021) (a plaintiff seeking relief for constructive discharge under the FMLA must show "her working conditions were so intolerable that a reasonable person in her position 'would have had no choice but to resign'" (quoting <u>Perkins v. Int'l Paper Co.</u>, 936 F.3d 196, 211 (4th Cir. 2019)); <u>Munday v. Waste Mgmt. of N. Am., Inc.</u>, 126 F.3d 239, 244 (4th Cir. 1997) (noting that, to succeed on a claim for constructive discharge, a Title VII plaintiff must show "deliberateness of the employer's action, and intolerability of the working conditions").

Case 1:21-cv-00052-TDS-JLW   Document 24   Filed 01/21/22   Page 15 of 37

govern a claim of constructive discharge." Id. "An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his coworkers. He is not, however, guaranteed a working environment free of stress." Goldsmith v. Mayor and City Council of Baltimore, 987 F.2d 1064, 1072 (4th Cir. 1993).

Sellers contends she has experienced more than "general dissatisfaction with her work environment" because "her health and safety were jeopardized by the Defendant's conduct." (Doc. 22 at 12.) Specifically, she contends that her manager, Paige Rideout, "placed undo stress upon [her] in an effort to force her to quit. The stress included changing [her] patient schedule without consulting or informing her, increasing her patient loads to an unmanageable level, encouraging insubordination by her medical assistant, Nikki Stukes, and minimizing her concerns." (Doc. 2 at 2.) She further alleges that when she submitted an amendment to her FMLA application, Rideout "slammed her hand on the desk and told [her] to leave." (Id.) As a result of these alleged instances, Sellers claims, she submitted her resignation. (Id.) Having a change of heart, she then attempted to rescind her resignation after an exit interview with Dr. Elisabeth Stambaugh, Chief Medical Officer of Wake Forest University Health Network. (Id.) Dr. Stambaugh refused to rescind the resignation, and

16

Sellers claims she was thus "constructively terminated."[3]  (Id.)

The record fails to create a genuine dispute of material fact as to the intolerability of her working conditions.  Taking each of her complaints in turn, the one instance in the record in which Sellers's patient schedule was modified without her knowledge resulted from Sellers informing Rideout that something had happened at work on June 5, 2020, that made her feel threatened and unsafe.  (Doc. 20-6 at 7.)  Rideout's affidavit states, and Sellers does not dispute, that Rideout "requested that [Sellers's] patient visits for the following Monday afternoon and Tuesday be cancelled or rescheduled."  (Id. at 8.)  Rideout was under the impression that Sellers would not be coming to work the week after the undisclosed incident in which Sellers felt threatened and unsafe at work.  (Id.)  Sellers, however, did show up for work the following week and was dismayed to learn that her patients had been rescheduled.  (Id.)  Sellers's medical assistant was able to schedule several of her patients back into the office on Monday and Tuesday of that week.  (Id.)  The rescheduling of patients in

---

[3] An employer's refusal to allow an employee to rescind her voluntary resignation does not constitute a constructive discharge.  See Rush v. Verizon Virginia, Inc., No. 7:04CV93, 2004 WL 2900654, at *3 (W.D. Va. Dec. 9, 2004) (no duty under the ADA to allow an employee who has resigned to rescind resignation); see also Jones v. Butler Metro. Hous. Auth., 40 F. App'x 131, 137 (6th Cir. 2002) (no duty for employer to accept employee's attempt to rescind resignation, and no "adverse employment action" for purposes of retaliation claim under federal law); accord Wilkerson v. Springfield Pub. Sch. Dist. No. 186, 40 F. App'x 260, 263 (7th Cir. 2002); Schofield v. Metro. Life Ins. Co., No. 3:CV-03-0357, 2006 WL 2660704, at *9 (M.D. Pa. Sept. 15, 2006).

response to an employee's stated unspecified fears is not an intolerable working condition.

Sellers next complains that her patient load was increased to an unmanageable level. While an increased patient load can be a difficult working condition, "difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign." Evans v. Int'l Paper Co., 936 F.3d 183, 193 (4th Cir. 2019). Sellers makes no claim and provides no evidence that her workload was increased disproportionate to that of other similarly situated employees. Nor has she presented any evidence as to the quantity of her patient load, when this increase took place, or the duration of the increase. As such, this ground fails. Goldsmith v. Mayor and City Council of Baltimore, 987 F.2d 1064, 1072 (4th Cir. 1993) (affirming dismissal of state claim for constructive discharge where employee failed to provide evidence that working conditions were unreasonably harsh in excess of that faced by her coworkers and "so intolerable that a reasonable person of reasonable sensibilities would be compelled to quit").

Sellers alleges that Rideout encouraged her medical assistant, Nikki Stukes, to be insubordinate. (Doc. 2 at 2.) This allegation stems from an incident between Sellers, Rideout, and Stukes on January 23, 2020. While there is some dispute as to the tone and specifics of the conversation, the material portions of the occurrence are undisputed, and the remaining facts are viewed

18

in the most favorable light to Sellers.

Apparently unhappy with the quality of Stukes's work, Sellers approached Rideout and said something to the effect that if she was expected to see a certain number of patients per day, she would need a medical assistant who was more readily available. (Doc. 20-1 at 339:4-9.) Sellers voiced this complaint while Rideout was in her "pod," an area open to both other medical staff and patients. (Id.; Doc. 20-6 at 2.) Sellers admits that when she made the statement, "it came across wrong," and both Rideout and Stukes were offended and perceived Sellers's comments as disrespectful. (Id. at 339:10-340:21.) Rideout "slammed the pod counter there and said 'just shut up. Just shut up. Don't say another word. You are not allowed to speak out here.'"[4] (Doc. 20-1 at 339:17-20.)

The undisputed evidence is that Stukes had been on the telephone with a patient when Sellers requested that she assist her with another patient currently in the office. (Doc. 20-6 at 2.) When Stukes told Sellers to wait until she finished her telephone call, Sellers left to complain to Rideout, and the above argument ensued. (Id.) The argument seemingly concluded with Rideout supporting Stukes, and a meeting was scheduled between

---

[4] Sellers characterizes this as "violent to me and degrading, demeaning, and very hurtful." (Doc. 20-1 at 339:17-20.) This also serves as a partial basis for her claim for emotional distress and is discussed in more detail below.

19

Sellers, Stukes, Rideout, and Dr. Lori Smith, Sellers's physician supervisor, to discuss how to communicate in a more constructive fashion. (Id. at 3.) At the conclusion of that meeting, Sellers apologized to Stukes. (Id.) The allegation that Rideout "encouraged insubordination" thus relates to Rideout supporting Stukes's side of the incident rather than Sellers's.

Friction between coworkers and management is not uncommon in the workplace, and only in the most extreme cases does it make an employee's work situation intolerable. For instance, in Williams v. Giant Food, Inc., the Fourth Circuit affirmed dismissal of plaintiff's constructive discharge claims, holding that being yelled at and told you are a poor manager and chastised in front of customers did not create conditions so intolerable as to compel a reasonable person to resign. 370 F.3d 423, 434 (4th Cir. 2004). In Carter v. Ball, the Fourth Circuit affirmed dismissal of the plaintiff's constructive discharge claims, holding that being unfairly criticized, losing supervisory responsibilities, and having one's supervisor display a poster that may have been offensive to African Americans was insufficient to establish a constructive discharge claim. 33 F.3d 450, 459-60 (4th Cir. 1994). And in Evans, the Fourth Circuit affirmed the grant of summary judgment against the plaintiff on her constructive discharge claim where Evans, an African American chemical engineer, alleged she was mistreated in comparison to white, male employees and that

20

white, male co-workers made racially insensitive and offensive comments that forced her to resign. 936 F.3d at 187, 194. These comments included that white male employees said an African American employee was "from a shoot em up, bang neighborhood," that Evans' natural hairstyle was unprofessional, and that she was nicknamed Angela Davis, after the civil rights and Black Panther activist because Davis "stirred up a lot of trouble." <u>Id.</u> at 189. Despite this, the Fourth Circuit concluded that summary judgment was warranted because "[t]he conditions, while no doubt frustrating and unpleasant to Evans, cannot, from an objective perspective, be construed to leave her no choice but to resign." <u>Id.</u> at 194. The court also noted that "[t]he record reflects many positive aspects of Evans' employment," citing Evans's resignation letter stating that while there had been challenges, her tenure was, "on the whole, satisfying and productive" and a "great experience." <u>Id.</u> at 194.

Here, even accepting all her claims and facts as true, Sellers has not shown that her working conditions were so intolerable as to require quitting. Her grievances are insufficient to cause a reasonable person to conclude that she has no alternative but to resign. Moreover, as in <u>Evans</u>, Sellers's resignation email belies her current characterization of her experience. In her email, Sellers noted "there are unsettled matters within the workplace at Internal Medicine at Westchester which remain," and offered an

exit interview "to communicate concerns related to these matters if senior leadership wishes." (Doc. 20-1 at 109.) But she also noted "I do appreciate the opportunity to work with Wake over the past 2 years. I have gained an irreplaceable amount of experience and I am appreciative for that. Thank you for allowing me the chance to grow as a practitioner." (Id.) Sellers continued, stating "thank you for the opportunity to serve my patients and for the chance to work beside some of the kindest, most compassionate providers in this area." (Id.) She concluded by stating, "[w]orking with staff at Internal Medicine has also been my pleasure and it was my honor to service their needs as well." (Id.) She even offered to work three weeks after giving her notice and asked to rescind her resignation 10 days later. As in Evans, Sellers's offer to work a notice period, her positive comments in her resignation letter, and her attempt to rescind her resignation and continue working for WFUBMC make clear that she has not presented sufficient evidence to meet her burden of establishing that her working conditions were so intolerable that a reasonable person would have felt compelled to resign.

Therefore, individually and collectively, Sellers's grounds for her claim for wrongful discharge fail, and WFUBMC's motion for summary judgment will be granted.[5]

---

[5] To the extent Sellers attempts to base her constructive discharge claim

## C. Emotional Distress

Sellers's second claim seeks damages for "emotional distress." (Doc. 2 at 3.) She alleges that WFUBMC knew of her "love and need for her position," "harassed and reprimanded" her while she was on FMLA leave, and "unjustifiably" disciplined her when she returned to work. (Id.) She concludes that "the conduct of Defendant, as herein set out, constitutes the tort of intentional and/or negligent infliction of emotional distress" and seeks punitive damages. (Id.)

WFUBMC moves to dismiss this claim and, in the alternative, for summary judgment. It argues that to the extent Sellers's cause of action is for negligent infliction of emotional distress (NIED), it should be dismissed because it alleges only intentional conduct and is also barred by "the doctrine of workers' compensation exclusivity." (Doc. 19 at 19.) To the extent it is a claim for intentional infliction of emotional distress (IIED), WFUBMC seeks summary judgment "because the undisputed facts fail to establish the requisite 'extreme and outrageous conduct required for a valid claim." (Id. at 20.)

To the extent Sellers's claim is for NIED, WFUBMC is correct that it fails to state a claim to survive dismissal pursuant to Rule 12(b)(6). In order to state a claim for NIED, a plaintiff

---

on a failure to accommodate under the ADA, her claim would fail for the reasons noted in the discussion of her ADA claim infra.

must allege that "(1) the defendant[] negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . .; and (3) the conduct did in fact cause the plaintiff severe emotional distress." Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 395 S.E.2d 85 (N.C. 1990). "In order to establish actionable negligence, a plaintiff must show that: (1) defendant failed to exercise due care in the performance of some legal duty owed to plaintiff under the circumstances; and (2) the negligent breach of such duty was the proximate cause of the injury." Guthrie v. Conroy, 567 S.E.2d 403, 410-11 (N.C. Ct. App. 2002).

Sellers has failed to allege any acts of negligence on the part of WFUBMC. Her complaint contains a single conclusory allegation that WFUBMC "by and through its duly authorized agents, was negligent in the training and retention of Plaintiff's supervisory personnel when it knew or should have known that their [sic] actions were causing injury to Plaintiff." (Doc. 2 at 3.) Sellers alleges no facts related to WFUBMC's training of employees or any specific facts or instances of WFUBMC's alleged negligence to render such a claim plausible. On the contrary, the complaint alleges only intentional wrongful acts and simply concludes that they were committed negligently, which "is insufficient to state a claim for negligent infliction of emotional distress." Barbier v. Durham Cnty. Bd. of Educ., 225 F. Supp. 2d 617, 631 (M.D.N.C.

2002) (citing <u>Mitchell v. Lydall, Inc.</u>, No. 93-1374, 1994 WL 38703, at *3-4 (4th Cir. Feb. 10, 1994)); <u>see also</u> <u>Thomas v. N. Telecom, Inc.</u>, 157 F. Supp. 2d 627, 637 (M.D.N.C. 2000) (dismissing claim for negligent infliction of emotional distress because plaintiff had only alleged conduct which is "inherently intentional"); <u>Robles v. Transdev North America, Inc.</u>, No. 1:15CV285, 2015 WL 4924733 n.3 (M.D.N.C. Aug. 18, 2015) (noting "conclusory allegations of negligence, supported by factual allegations of nothing but intentional acts, cannot state a claim for negligent conduct.").

As to Sellers's claim of IIED, WFUBMC is entitled to summary judgment.  Under North Carolina law, the essential elements of an IIED claim are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another."  <u>Dickens v. Puryear</u>, 276 S.E.2d 325, 335 (N.C. 1981). IIED may also "exist where defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress."  <u>Id.</u>  "The determination whether conduct rises to the level of extreme and outrageous behavior is a question of law."  <u>Foster v. Crandell</u>, 638 S.E.2d 526, 537 (N.C. Ct. App. 2007).  To be extreme and outrageous, conduct must "go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community."  <u>Smith-Price v. Charter Behav. Health Sys.</u>, 595 S.E.2d 778, 782 (N.C. Ct. App.

25

2004) (internal quotation marks and citation omitted). North Carolina courts have set a high threshold for this standard. See Dobson v. Harris, 521 S.E.2d 710, 715 (N.C. Ct. App. 1999) (finding an exaggerated report of child abuse to the Department of Social Services not extreme and outrageous), rev'd on other grounds, 530 S.E.2d 829 (N.C. 2000); Hogan v. Forsyth Country Club Co., 340 S.E.2d 116, 121, 123 (N.C. Ct. App. 1986) (finding that requiring pregnant employee to carry heavy loads and refusing to allow her leave to go to the hospital not extreme and outrageous conduct). North Carolina courts "rarely find conduct in the employment context that will rise to the level of outrageousness necessary to support a claim of intentional infliction of emotional distress." Smith v. Comput. Task Grp., Inc., 568 F. Supp. 2d 603, 621 (M.D.N.C. 2008) (internal quotes and citations omitted); see, e.g., Thomas, 157 F. Supp. 2d at 635; Haburjak v. Prudential Bache Sec., Inc., 759 F. Supp. 293, 302-03 (W.D.N.C. 1991) (listing state court cases); Locklear v. Person Cnty. Bd. of Educ., No. 1:05CV255, 2006 WL 1743460, at **15-16 (M.D.N.C. June 22, 2006); Jackson v. Blue Dolphin Commc'ns of N.C., L.L.C., 226 F. Supp. 2d 785, 794 (W.D.N.C. 2002). Liability "does not extend to mere insults, indignities, [or] threats." Hogan v. Forsyth Country Club Co., 340 S.E.2d 116, 123 (N.C. Ct. App. 1986). "In cases where North Carolina courts have found IIED claims actionable, the conduct has been extremely egregious, and involved sexual advances, obscene

26

language, and inappropriate touching." Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 545 (E.D.N.C. 2008) (collecting cases).

Here, Sellers has failed to show conduct by WFUBMC that, if believed, is sufficiently extreme and outrageous. See Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C. 1981). She claims that WFUBMC "placed undo [sic] stress upon [her] in an effort to force her to quit . . . include[ing] changing [her] patient schedule without consulting or informing her, increasing her patient loads to an unmanageable level, encouraging insubordination by her medical assistant . . . and minimizing her concerns." (Doc. 2 at 2.) She also points to WFUBMC's refusal to rescind her resignation. (Id.) None of this, alone or together, rises to the level of "extreme and outrageous" conduct that is "utterly intolerable in a civilized community." Smith-Price v. Charter Behav. Health Sys., 595 S.E.2d 778, 782 (N.C. Ct. App. 2004). Cf. Brown v. Burlington Industries, Inc., 378 S.E.2d 232, 235 (N.C. Ct. App. 1989) (finding extreme and outrageous conduct where the defendant asked the plaintiff "'how tight [she] was,' referring to her vagina," indicated that he wanted plaintiff's "long legs wrapped around his body," grabbed his penis, and implied that if plaintiff would have sex with him, he would place her in another position, and held her paycheck while puckering his lips), disc. review allowed, 384 S.E.2d 513 (N.C. 1989), review dismissed as improvidently granted, 388 S.E.2d 769

(N.C. 1990); McLain v. Taco Bell Corp., 527 S.E.2d 712, 715 (N.C. Ct. App. 2000) (finding extreme and outrageous conduct where a defendant "physically assaulted plaintiff, . . . [demanded] sexual relations . . . [and] began masturbating, ultimately ejaculating upon plaintiff's clothing"), disc. review denied, 544 S.E.2d 563 (N.C. 2000); Dickens v. Puryear, 276 S.E.2d 325, 327 (N.C. 1981) (holding that pointing a gun at a plaintiff's face while "four men wearing ski masks and armed with nightsticks then approached from behind plaintiff and beat him into semi-consciousness" was sufficiently extreme and outrageous).

Many employees may face difficult managers, unmanageable workloads, and tension with their coworkers. But these are insufficient to support an IIED claim. Sellers's NIED and IIED claims will therefore be dismissed on WFUBMC's motions to dismiss and for summary judgment, respectively.

### D. Americans with Disabilities Act

Sellers's third claim alleges WFUBMC violated the ADA when it "intentionally discriminated against her on the basis of her disability" by failing to provide her with reasonable accommodation when she requested a quiet workspace where she could focus on completing job-related paperwork. (Doc. 2 at 4.) According to Sellers, this, in combination with the previously discussed conditions of her work environment, exacerbated her attention deficit disorder and caused her physician to place her

28

on medical leave for a short period. (Id.) Upon return from her medical leave, Sellers alleges, her request for an additional four-hour per week reduction in work hours was met "with hostility and unwarranted disciplinary actions." (Id.) WFUBMC moves for summary judgment on Sellers's claim on the ground there was no indication that she needed the accommodation to satisfactorily perform her job duties. (Doc. 19 at 16.)

The ADA generally prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). One form of discrimination is failing to make "reasonable accommodations" for a disabled employee's "known physical or mental limitations," unless the employer "can demonstrate that the accommodation would impose an undue hardship" on its business. Id. § 12112(b)(5)(A). To show an employer's failure to accommodate, the plaintiff must prove: (1) that she had a disability within the statutory meaning; (2) that the employer knew of her disability; (3) that a reasonable accommodation would permit her to perform the essential functions of the position; and (4) that the employer refused to make the accommodation. Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013). Even if a plaintiff makes this showing, the employer can still defeat the failure-to-accommodate claim by demonstrating that the accommodations would impose an undue hardship. U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 395 (2002).

29

WFUBMC does not dispute that Sellers has ADHD, that ADHD can be a disability within the meaning of the ADA, and that her coworkers were aware of her condition. (Doc. 19 at 16.) The question is whether she has satisfied the final two elements. WFUBMC argues that, because Sellers could perform her job duties at a satisfactory level without accommodation, "there is no need for the employer to provide [a reasonable accommodation]." (Id.)

This argument too narrowly construes the burden placed on employers by the ADA. Title I of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id § 12111(8) (emphasis added). As WFUBMC has admitted, Sellers could adequately perform the essential functions of her employment, including seeing patients and charting their information after the visits. WFUBMC points to the fact that Sellers was capable of completing her work and cites her desire to be overly meticulous as the reason for any delay. (Doc. 19 at 16-17.) Because Sellers could perform the essential functions of her job with or without reasonable accommodation, she is a qualified individual under the ADA. The question then becomes, whether a reasonable accommodation would enable Sellers to complete her job and if so, whether she was denied a reasonable

30

accommodation by WFUBMC.

According to Sellers, her ADHD prevented her from staying focused at times, making it difficult for her to complete her charting. (Doc. 22-1 at 133:3-4.) In her deposition, Sellers noted that some evenings she would spend hours after her shift completing her charting in a quiet environment due to her ADHD. (Id. at 132:2-11.) However, this only happened "[w]hen patient volume would increase," and there is no evidence in the record that Sellers's experience with longer than normal charting times was due to her ADHD rather than an increased quantity of patients. (Id.) Nor does Sellers allege that this increased patient load was a problem unique to her or that her charting experience was different from that of any other similarly situated nurse practitioner during periods of higher patient volume. There is no evidence that Sellers could not complete her job absent accommodation or that an accommodation would enable her to perform the essential duties which her ADHD prevented her from doing. Sellers complains about the time she spent charting; however, Dr. Smith told her that her charting "was more detailed than necessary" and that she should "be less detailed in her documentation and [] spend less time on it." (Doc. 20-7 at ¶ 4.)

Even assuming Sellers's ADHD contributed to her long hours charting and an accommodation could better enable Sellers to perform her duties, the record reflects that Sellers was given

31

reasonable accommodation when possible.  See Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 464 (4th Cir. 2012) (noting employers need not provide an employee's proposed accommodation if it "will cause undue hardship in the particular circumstances." (internal quotations omitted)).  Sellers admits that on numerous occasions she was able to use various offices as her own when they were not being used.  This includes Dr. Smith's office, which Sellers used "frequently," (Doc. 20-1 at 113:10-12; Doc. 20-7 at ¶ 6) and Rideout's office, which Sellers used occasionally (Doc. 20-1 at 123:19-23; Doc. 20-6 at ¶ 15(c).  Additionally, once open space became available, Sellers was able to permanently move into one of two vacant offices where she would have a private space free from distractions.  (Doc. 22-1 at 133:5-21.)  In her deposition, Sellers specifically recalled "those other two offices being open and available for [her] to utilize." (Id. at 132:12-16.)  WFUBMC's accommodations for Sellers came in spite of WFUBMC's "limited" space and in spite of the fact that only physicians received private offices.  (Doc. 20-6 at ¶ 15(c).)  Every time Sellers made a request for an accommodation, she was provided one, and at no point did Sellers inform WFUBMC that the accommodation she received was inadequate.

The ADA requires neither a perfect accommodation nor the exact accommodation requested by the employee.  See Reyazuddin v. Montgomery Cnty., Md., 789 F.3d 407, 415 (4th Cir. 2015); Hannah

32

P. v. Coats, 916 F.3d 327, 337 (4th Cir. 2019). Access to a private office, an accommodation not available to other nurse practitioners, was a reasonable accommodation offered to and accepted by Sellers, which provided her "a meaningful equal employment opportunity." Reyazuddin, 789 F.3d at 415. WFUBMC's accommodation gave Sellers "an opportunity to attain the same level of performance as is available to nondisabled employees having similar skills and abilities." Id. at 416. As such, WFUBMC did not fail to accommodate her disability, and WFUBMC is entitled to summary judgment on Sellers's failure to accommodate claim.

To the extent Sellers contends WFUBMC failed to accommodate her GAD, that claim is without merit. The only accommodation Sellers requested in connection with her GAD was FMLA leave, which she was indisputably granted. (Doc. 20-1 at 250:15-18.)

**E. Bonus Money**

Sellers alleges that she received performance bonuses for both 2019 and 2020 during her employment with WFUBMC. (Doc. 2 at 6.) She claims that despite her demands, WFUBMC has failed to pay these bonuses. (Id.) WFUBMC moves for summary judgment on the ground that Sellers received all bonus money for which she was eligible. (Doc. 19 at 12.) In support of its motion, WFUBMC attaches proof of payment, and Sellers does not address this argument in her response brief. The court therefore considers it conceded. L.R. 7.3(k). However, the Fourth Circuit still requires

33

that unopposed dispositive motions be reviewed to determine if dismissal is proper. <u>Jones v. SSC Durham Operating Co., LLC</u>, No. 1:17CV686, 2019 WL 290036, at *2 (M.D.N.C. Jan. 22, 2019) (citing <u>Stevenson v. City of Seat Pleasant, Md.</u>, 743 F.3d 411, 416 n.3 (4th Cir. 2014)). Even so, the court's review on the merits demonstrates that dismissal is appropriate.

WFUBMC attaches the affidavit of Mary Rice, Associate Vice President and Chief Financial Officer for WFUBMC, in which Rice notes that for the 2019 fiscal year, Sellers was entitled to a bonus of $1,231.02. (Doc. 20-5 at ¶ 9.) For the first and second quarters of 2020, Sellers was entitled to bonuses of $261.55 and $800.47, respectively. (<u>Id.</u> at ¶¶ 11, 13.) Affixed to Rice's affidavit are financial records indicating Sellers's paychecks for the relevant periods. (<u>Id.</u> at 10-13.) Each paycheck contains Sellers's base pay as well as a line for any bonus payments she received. (<u>Id.</u>) Each paycheck reflects the bonus Sellers received for that time period. For instance, for the second quarter of 2020, which ran from October to December of 2019, Sellers's paycheck reflects a bonus payment of $800.47, which is what she was owed according to Rice. (<u>Id.</u> at 12.) There are paychecks reflecting bonuses in the other amounts noted by Rice as well. Sellers does not contest the validity of these records.

In January 2020, WFUBMC modified its compensation model to include incentive payments based on productivity. (<u>Id.</u> at ¶ 14.)

34

These incentives are available to those advanced practice providers whose productivity was in the 60th percentile or above. (Id.) Sellers seemingly did not qualify for this incentive bonus as she was below the 60th percentile for productivity. (Id. at ¶ 16.)[6] In addition to the incentive bonuses, all advanced practice providers, no matter their productivity, were eligible to receive a flat value incentive bonus based on their specialty of care. (Id.) This flat value bonus was $2,500 per fiscal year. (Id.) However, because the compensation model was modified in January of 2020, halfway through the 2020 fiscal year, only half of the flat value bonus was available to advanced practice providers like Sellers. (Id.) Therefore, Sellers was entitled to $1250.00 which she received in her July 31, 2020 paycheck. (Id. at 13.)

Sellers does not dispute any of the amounts listed by Rice. At her deposition, Sellers could not articulate the amount she was owed for 2019 or for 2020. (Doc. 20-1 at 85:16-88:21.) In deposition she stated that she was entitled to $1,250.00 of "incentive pay" because, while she left the office on July 2, her notice extended through July 12. (Id.) It is unclear which incentive Sellers is discussing, but presumably she is referring to the other half of the $2,500 flat value bonus. The fact that her notice extended for another week does not have any bearing on

---

[6] Sellers does not dispute that she was below the 60th percentile for productivity as measured by her accrued work relative value units.

whether she was eligible for a productivity incentive bonus, because that extra week was her furlough week in which she would not see any patients. (Id.)

To the extent Sellers argues she is entitled to $1,250.00 as another half of the flat value incentive, she is incorrect. July 1 began the new fiscal year for WFUBMC. The flat value incentives are paid on a yearly basis. (Doc. 20-5 at ¶ 15.) Therefore, the flat value incentive for the 2021 fiscal year would be paid on July 31, 2021, as a bonus for the last year. Sellers received $1,250 for half of the 2020 fiscal year between January 1 and July 31, 2020, which was half of the yearly bonus because the bonus program started halfway through the 2020 fiscal year. (Id. at 13.) Having an additional week in her notice period during which she could not work because she was furloughed would not entitle her to an additional flat value bonus.

As noted, Sellers does not contest either the validity or accuracy of the financial records indicating she was paid all bonuses for which she was eligible. Therefore, based on the undisputed facts, WFUBMC's motion for summary judgment on Sellers's fourth cause of action is granted to all claims for bonus money.

### III. CONCLUSION

For the reasons stated,

36

IT IS ORDERED that WFUBMC's motion for summary judgment as to Sellers's claims for wrongful constructive discharge, intentional infliction of emotional distress, failure to accommodate pursuant to the ADA, and unpaid bonus money is GRANTED, and judgment shall be entered for WFUBMC.

IT IS FURTHER ORDERED that WFUBMC's motion to dismiss Sellers's claim for negligent infliction of emotional distress is GRANTED and that claim is DISMISSED.

As this disposes of all of Sellers's claims, the Clerk of Court is directed to close this case.

/s/   Thomas D. Schroeder
United States District Judge

January 21, 2022